# In the United States Court of Federal Claims

No. 21-1492C
(Filed: June 5, 2023)

* * * * * * * * * * * * * * * * * * * *

JOHN MURRAY *et al.*,

       *Plaintiffs*,

v.

THE UNITED STATES,

       *Defendant*.

* * * * * * * * * * * * * * * * * * * *

    *Kevin R. Garden,* The Garden Law Firm, P.C., Alexandria, VA, for plaintiffs.

    *Christopher L. Harlow*, Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Franklin E. White, Jr.*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, for defendant. *Aaron Buzawa*, Attorney-Advisor, United States Department of Agriculture, Office of the General Counsel, Portland, OR, of counsel.

## OPINION

BRUGGINK, *Judge*.

    This is an action for breach of contract against the United States in which plaintiffs allege that the United States Forest Service ("the Forest Service") breached its duty under the permit it issued plaintiffs to operate a ski resort on Forest Service land. Plaintiffs in this case are John and Nancy Murray, who operated a ski area known as the Spout Springs Mountain

1

Resort ("Spout Springs") on federal land.[1] The Murrays allege that the Forest Service's authorization of snowmobile-related activities in the Spout Springs parking lot was a breach of its duty to not authorize third-party uses that would "materially interfere" with the Murrays' operation of Spout Springs.

The complaint was filed on June 21, 2021. After the conclusion of discovery, defendant filed a motion to dismiss, or alternatively, for summary judgment, on December 9, 2022. The motion has been fully briefed, and oral argument was held on April 12, 2023. For reasons stated below, we grant defendant's motion to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").

FACTS

### I. The Murrays' Purchase of Spout Springs and Beginning of Operations

Spout Springs is a ski area and operation located in the Umatilla National Forest in Oregon. Compl. ¶ 4, 5. Although the ski area is located on federal land, the improvements at the ski area are privately owned. *Id*. at ¶ 10. John and Nancy Murray purchased the improvements at Spout Springs on June 30, 1999. Def.'s Appx. ("DA") at 15.

Before beginning operations at Spout Springs, the Murrays first entered into a Snow Removal Agreement ("SRA") with the State of Oregon on November 8, 1999.[2] DA at 23. Under the SRA, the Oregon Department of Transportation ("ODOT") designated the Spout Springs parking lot as a Sno-Park—a winter recreation parking area where Sno-Park permit holders could park their vehicles at no additional charge. *See id*. at 19, 30. The designation required Spout Springs to install "Sno-Park Permit Required" signs in the parking lot and "allow equal access to said area for all winter recreational purposes to both patrons and members of the public with no additional charge for parking in said area." *Id*. at 20. In exchange, the ODOT would provide snow removal service for the Spout Springs parking lot. *Id*. at 19.

On December 31, 1999, the Forest Service issued John and Nancy

---

[1] Spout Springs is also a named plaintiff to this action.

[2] The 1999 Agreement was then superseded by a new Snow Removal Agreement on October 13, 2009, and again on April 24, 2014. DA at 18, 25. The terms were not materially different.

Murray a Ski Area Term Special Use Permit ("the Permit") that would expire on December 31, 2039. DA at 1, 2. Under the Permit, the Murrays were authorized to use land within the Umatilla National Forest "for the purposes of constructing, operating, and maintaining winter sports resort . . . known as the Spout Springs Mountain Resort ski area." *Id*. at 1. The Permit required the Murrays to exercise their use of the land "at least 90 days each year or season," and to "maintain the improvements and premises to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the [Forest Supervisor]." *Id*. at 3.

At the same time, the Forest Service "assume[d] no responsibility for enforcing laws, regulations, ordinances and the like which are under the jurisdiction of other government bodies." *Id*. at 2. The Permit also stated that the Forest Service "reserve[d] the right to use or permit others to use any part of the permitted area for any purpose, provided such use does not materially interfere with the rights and privileges hereby authorized." *Id*. It is this provision that plaintiffs claim was breached by the Forest Service.

## II. Snowmobile-Related Activities at the Spout Springs Parking Lot

After the Murrays began operation of Spout Springs, they communicated with the ODOT several times in the first few years regarding the SRA. One of such letters is dated June 14, 2001, addressed from the ODOT to Mr. Murray. DA at 36. In that letter, the ODOT first informed Mr. Murray that the "Rules of Use" document he had forwarded "do not appear to conflict with or limit a ski area's ability to participate in the State Sno-Park program." *Id*. The letter leaves unclear, however, what the "Rules of Use" consisted of and what had prompted Mr. Murray to inquire about a potential conflict between the SRA and those rules. *See id*. The ODOT then reminded Mr. Murray that "[a]s a condition of participation in the Sno-Park program, the parking area must be open to members of the public with a valid Sno-Park permit for all winter recreational purposes and no additional charge for parking may be assessed." *Id*. It added, however, that a ski area could still "post parking instructions or limit overnight parking to facilitate snow removal." *Id*. In the event that Mr. Murray chose to establish rules of use specific to Spout Springs, the ODOT requested that he "take into account the conditions for Sno-Park designation." *Id*.

Another letter from the ODOT to Mr. Murray dated June 12, 2002, shows that Mr. Murray had a number of concerns regarding the Sno-Park program. *Id*. at 37. Referring to a phone conversation that took place on June 7, 2002, the letter memorialized the issues that were discussed. One of those

3

issues included "the terms of [the Murrays' Permit] as it applies to the area in front of the cabins located across the highway from the ski area." *Id.* Other than directing Mr. Murray to seek clarification with the Forest Service, however, the letter does not indicate what Mr. Murray's specific concerns were and what sort of "activities" may have been occurring "near the cabins." *See id.* Similarly, the letter does not provide details about Mr. Murray's "concern with the enforcement services provided last season by the [Forest Service]." The letter merely suggests that his concern had to do with the Forest Service's "enforce[ment] [of] the Sno-Park permit requirement," which the ODOT could not address because it had no contract with the Forest Service. *Id.*

At some point in 2004, the Forest Service asked the Murrays if Spout Spring would "agree to allow certain limited snowmobile related activity occur in the ski area parking lot." Compl. ¶ 26. The request signified a change in Forest Service policy, because "[a]t the time Spout Springs . . . began its operations at the permit area, no snowmobile activity was authorized in or around the permit area or its parking lot." *Id.* at ¶ 22; *see also* Def.'s Supp. Appx. ("DSA") at 9 (Mr. Murray testifying at his deposition that although "snowmobiles were always in the area," their presence was "highly controlled" and "operation of them was prohibited" at the time he bought Spout Springs). The Murrays agreed to the Forest Service's request to allow snowmobile-related activities, "subject to the caveat that if such activity became unacceptable . . . the activity would again be prohibited." Compl. ¶27. Thus, upon the Murrays' agreement, snowmobile-related activities were allowed in the Spout Springs parking lot from 2004 onwards. *Id.* at ¶ 28.

The record indicates that snowmobile-related activities began to affect the operation of Spout Springs around 2010, when "oversized snowmobiles" started to turn up at the ski area. *See* DA at 90 (Mr. Murray testifying at his deposition that high-speed snowmobiles and the "super trailer[s]" that facilitated them "didn't really exist until about 2010, 2012"); *id.* at 95 ("[2011] is when we started noticing the big rigs and the high performance snowmobiles. And the camping, you know, they'd come with places to sleep in them, as well."). According to Mr. Murray's deposition testimony, "Nothing ever changed until they showed. When they showed, things changed. I mean, it was day and night." *Id.* at 94. Pointing to the period between 2010 and 2012 as marking "the advent of the super trailers where they would show up with six snowmobiles," *id.* at 88, Mr. Murray testified that "that's when the complaints kind of started happening and when the law, Forestry got involved." *Id.* at 90. Skier business "was dropping off" around then, and "[p]eople were complaining, angry." *Id.* at 93. More than once in his deposition testimony, Mr. Murray referred to "[r]ight around 2010" as

4

when "[t]hings started turning": "We weren't having the same years, the same turnout." *Id*. at 96. He also testified that the Murrays "started talking about [shutting down Spout Springs] in '12, '13": "Because attendance was falling off, you know. We were starting to get a reputation of a snowmobile/ski area." *Id*.

Mr. Murray stated at his deposition that not all snowmobile recreationists posed a problem for Spout Springs; the problem "just got down to 20 angry people with large trailers" or "a group of guys up there that are like nuts." DA at 93, 87. It did not take many of them to create trouble: "All you need is a dozen, couple dozen. Then you've got issues with the cleaning, safety. Liability." *Id*. at 93. The complaint alleges that those individuals would drive their snowmobiles through the parking lot "at very high and unsafe speeds," which resulted in "several close calls where serious injury was narrowly averted." Compl. ¶¶ 32, 34; *see also* DA at 84 (Mr. Murray's deposition testimony describing "close calls" as a result of "[p]eople speeding on snowmobiles"). Mr. Murray himself received death threats for trying to photograph snowmobile-related activities at the parking lot, with threats dating back to the period between 2010 and 2012. *See* DA at 93; Pls.' Appx. ("PA") at 110.

Correspondence between Mr. Murray and the Forest Service corroborates the period between 2010 to 2012 as the point at which issues with snowmobile trailers became serious. In a letter dated July 27, 2010, Mr. Murray told the Forest Service that "Spout Springs Parking Lot will be closed to all snowmobile trailers and RV's effective the 10/11 season." DA at 43. He continued, "We will direct this traffic to other snow parks nearby. . . . This decision has been made in light of the current and pasts [sic] management problem in the parking lot." *Id*.

In a response letter dated March 7, 2011, the Forest Service referred to a "revised plan [that] will replace the 2004 parking plan approved under [the Murrays'] Ski Area Term Special Use Permit." *Id*. at 40. The revision chiefly consisted of allowing "additional day-use trailer parking" at the parking area on the north side (ski area side) of the highway, next to where the overnight trailers could park. *Id*. The Forest Service thanked Mr. Murray for his "willingness to give this new arrangement a try" even though doing so "may reduce available resort parking during the busiest times of the winter." *Id*. At the same time, the Forest Service requested that he remove the "Resort Parking Only-No Trailers" signs he had posted in the parking lot "as soon as practical." *Id*.

Despite these problems arising as early as 2010, Mr. Murray testified

5

in his deposition that he initially felt that they were "manageable" and that the Forestry Service "would intervene"—"You know, we had high hopes. We were very, very optimistic." PA at 104. He described "some effort early on" that made him optimistic, such as the presence of the ODOT crew manager "once or twice" on site and the police writing tickets. *Id*. at 105. But according to his deposition testimony, law enforcement "gradual[ly] disappear[ed]," *id*. at 107, and at the same time, problems that began in 2010 "seemed to grow worse and worse." *Id*. at 110. The Murrays allege that even though they "informed the Forest Service of the dangerous snowmobile related activity and attempted to undertake efforts to eliminate the dangerous activity in and around the parking lot," their efforts "were met with either indifference, hostility or adversity by the individuals engaging in the snowmobile related activity, local law enforcement, and the Forest Service." Compl. ¶¶ 35-36.

With the situation becoming "progressively worse," by 2016 the Murrays felt like they were "in trouble." PA at 113. As Mr. Murray testified at deposition, "By '16, '17 [it was] getting crazy. . . . Probably less than five years we realized that we were not in control. We weren't getting the type of help we needed from law enforcement or the Forestry Service." *Id*. at 112. In an email sent to the Forest Service on April 14, 2017, Mr. Murray attached photographs of the parking lot taken during the 2015-2016 season, which he identified as demonstrating the "type of situation [that we have identified] as a safety hazard." DA at 63. He stated that the situation was affecting "the business monetarily" and that he had "submitted similar photos almost every year since 2011." *Id*. "The only difference year to year," he wrote, "is that every year it gets a little more unmanageable, we get more complaints from our customers, and less of the lot is cleaned by ODOT." *Id*.

It was also in 2016 that Spout Spring's insurance agent "expressed serious concerns about the clearly unsafe snowmobile related activity occurring in the parking lot, which included snowmobilers driving through the parking lot and consuming alcohol in the parking lot, as well as inadequate plowing of the parking lot due to the presence of snowmobile trailers." Compl. ¶ 37. In an email dated August 1, 2016, the Murrays' insurance agent suggested obtaining a legal opinion as to whether the Forest Service was "materially interfere[ing]" with rights authorized under the Permit by "creating a greatly reduced parking area as well as creating a substantial risk to [the Murrays] and the public." PA at 42.

### III.   The Closure of Spout Springs in the 2016/2017 Winter Season

In 2016, the Murrays requested that the Forest Service no longer allow

snowmobile-related activities in the Spout Springs parking lot. Compl. ¶ 40. When the Forest Service refused, Spout Springs ceased operations beginning in the winter 2016-2017 season. *Id*. at ¶¶ 44-46. An email written by a Forest Service employee on December 13, 2016, describes the situation at Spout Springs as follows: "This situation [involving snowmobilers at Spout Springs] has been festering for a few years and the owner says he's had confrontations with snowmobilers in the parking lot, been threatened, and had problems with snowmobilers hot rodding all over the parking lot and endangering skiers. So now the owner says he won't open unless the parking lot on the ski area side can be all day use with no trailers. Since the Forest Service isn't willing to approve that change the owner has decided he won't open." PA at 61. Stuck at an impasse with the Forest Service, Spout Springs remained closed through the 2016-17, 2017-18, 2018-19, and 2019-20 winter seasons. DA at 51.

On January 4, 2021, the Forest Service revoked plaintiffs' Permit, citing noncompliance with its terms and conditions. Compl. ¶ 55. Specifically, noncompliance occurred "because the Resort had not operated for the minimum of 90 days per year since 2016 despite adequate snow conditions, an operating plan had not been submitted since 2018, and no insurance had been obtained." DA at 56. Although the Forest Service had presented "the option to begin proceedings to sell the Resort" as an "alternative to curing those issues," the Murrays neither cured the noncompliance issues nor alternatively sold the Resort. *Id*.

The Murrays appealed the Permit revocation on February 3, 2021. Compl. ¶ 57. The Appeal Deciding Officer denied the appeal on April 5, 2021, which the Forest Service affirmed on May 28, 2021. *Id*. at ¶¶ 58, 60. Plaintiffs then filed this lawsuit seeking compensation for the Forest Service's breach of its obligations under the Permit on June 21, 2021.

## DISCUSSION

To determine whether this court has subject matter jurisdiction, the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). If a motion to dismiss challenges a jurisdictional fact, however, fact-finding by the court is proper. *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (citing *Reynolds v. Army & Air Force Base Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988)). Moreover, the plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *See Reynolds*, 846 F.2d at 748.

One of the jurisdictional requirements in this court is that a claim must be brought "within six years after such claim first accrues." *Accord* 28 U.S.C. § 2501 (2018); *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 132 (2008) (holding that the statute of limitations under § 2501 is jurisdictional and not subject to waiver). A claim first accrues under § 2501 "when all the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action." *Holmes v. United States*, 657 F.3d 1303, 1317 (Fed. Cir. 2011). Where the claim is for a breach of contract, the claim accrues when the alleged breach occurs. *Id*.

Importantly, when a claim accrues does not depend "upon the time at which the *consequences* of the [unlawful] acts became most painful." *Hamilton Square, LLC v. United States*, 160 Fed. Cl. 617, 623 (2022) (quoting *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)). The plaintiff, however, must have actual or constructive knowledge that the breach occurred. *See Holmes*, 657 F.3d at 1317 (holding that accrual of a claim was suspended when the plaintiff showed that "the defendant has concealed its acts with the result that plaintiff was unaware of their existence" or that "its injury was 'inherently unknowable' at the accrual date") (quoting *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008)).

Here, the Permit constitutes a valid contract between plaintiffs and the Forest Service, which imposed upon the Forest Service a duty not to authorize third-party uses of Spout Springs that would materially interfere with plaintiffs' operations.[3] *See* DA at 2 ("The Forest Service reserves the right to use or permit others to use any part of the permitted area for any purpose, provided such use does not materially interfere with the rights and privileges hereby authorized."). Plaintiffs allege that the Forest Service breached that contractual duty by authorizing snowmobile-related activities in the Spout Springs parking lot, which materially interfered with their operations. Because plaintiffs filed their breach-of-contract claim on June 21,

---

[3] The Permit, to be clear, did not impose upon the Forest Service a duty of law enforcement with regard to third-party activities at the Spout Springs parking lot. *See* DA at 2 ("The Forest Service assumes no responsibility for enforcing laws, regulations, ordinances and the like which are under the jurisdiction of other government bodies."). Thus, a breach of duty, if any, must be found in the Forest Service's authorization of snowmobile-related activities in the Spout Springs parking lot—what role the Forest Service did or did not play in enforcing the law with regard to those activities is irrelevant.

2021, however, this court would lack jurisdiction if the breach occurred earlier than June 21, 2015. Plaintiffs contend that material interference did not occur earlier than 2016, whereas defendant argues that material interference dates back to at least 2011.[4]

It is uncontroverted that although the Forest Service authorized (with plaintiffs' consent) snowmobile-related activities in the Spout Springs parking lot beginning in 2004, high-speed snowmobiles and oversized trailers did not appear on the market or at Spout Springs until around 2010. *See* DA at 90. It is also undisputed that plaintiffs sought (unsuccessfully) to limit snowmobile-related activities in the parking lot from 2010 onwards. The record contains a letter Mr. Murray wrote to the Forest Service on July 27, 2010, stating his intent to close the parking lot to "all snowmobile trailers and RV's effective the 10/11 season." *See id*. at 43. There is also a letter dated March 7, 2011, in which the Forest Service requested that Mr. Murray remove the "Resort Parking Only—No Trailers" signs he had posted around the parking lot. *See id*. at 40. And in an email that Mr. Murray wrote to the Forest Service on April 14, 2017, he referred to photographs he had submitted "almost every year since 2011" to document safety hazards in the parking lot. *See id.* at 63.

Although plaintiffs do not contest these facts, they argue the snowmobile-related activities caused "negligible," rather than material, interference with their business before 2016. *See* Oral Arg. at 1:02:00 to 1:04:00. In particular, they point to Mr. Murray's deposition testimony that problems in the parking lot "got progressively worse" and that he "didn't feel like we were in trouble until 2016, 2017." *See* PA at 113. As the court held in *Hamilton Square*, however, when a breach-of-contract claim accrues does not depend on the plaintiffs' subjective evaluation of when the consequences of the defendant's breach became most acute. *See* 160 Fed. Cl. at 623. It may well be that plaintiffs only felt compelled to close Spout Springs in 2016— but that does not necessarily mark when the Forest Service's authorization of snowmobile activities materially interfered with their business.

What constitutes "material" interference is a question of contract interpretation that the court must resolve, which begins with the "plain language" of the contract. *See Giove v. Dep't of Transp*., 230 F.3d 1333, 1340

---

[4] For purposes of its motion to dismiss, defendant assumes two things: first, that "the Forest Service was responsible for allowing snowmobilers to use the Spout Springs parking lot"; and second, that "snowmobilers actually engaged in unruly behavior, despite the fact that local law enforcement was unable to corroborate these allegations." Def.'s Mot. to Dismiss at 9.

(Fed. Cir. 2000). The court gives "the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Id.* (quoting *Harris v. Dep't of Veteran Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998)). Because the Permit does not define the word "material," we turn to its ordinary meaning as defined in the dictionary: "Of serious or substantial import; significant, important, of consequence." *Material*, Oxford English Dictionary (2023). Based on that meaning of "material," we disagree with plaintiffs' assertion that they did not suffer material interference with the operation of Spout Springs prior to its closure in 2016. The word "material" simply is not so categorical or extreme. Material interference is interference serious and substantial enough to prompt action on the part of the business to mitigate the situation.

The record indicates that conditions for material interference were satisfied as early as 2010 and at the latest by 2013. As described above, Mr. Murray started to take steps to limit snowmobile-related activities in his parking lot from 2010 onwards: he posted signs banning snowmobile trailers, took photographs of the parking lot (even when doing so led to death threats from angry snowmobile recreationists), and communicated his concerns to the Forest Service. These are not actions that a person would take in the absence of a serious and substantial interference with the operation of a business. Indeed, we need only look to Mr. Murray's own deposition testimony about the seriousness of the problem well before 2016. At his deposition, Mr. Murray identified "[r]ight around 2010" as "when [t]hings started turning" so that Spout Springs wasn't "having the same years, the same turnout." DA at 96. He even testified that the change wrought by high-speed snowmobiles and oversized trailers was "day and night," *see id.* at 94, and that he "started talking" about shutting down Spout Springs in 2012 or 2013 because "attendance was falling off" and they were "starting to get a reputation of a snowmobile/ski area." *See id.* at 96. A negative impact on both revenue and business reputation is undoubtedly sufficient to constitute material interference with a business.

The breach that plaintiffs allege therefore occurred before June 21, 2015, and plaintiffs' claim is not timely under § 2501. Because we lack jurisdiction over this action, we need not address defendant's alternative motion for summary judgment.

## CONCLUSION

For the foregoing reasons, defendant's motion for dismissal under RCFC 12(b)(1) is GRANTED. The Clerk is directed to enter judgment accordingly. No costs.

<u>s/Eric G. Bruggink</u>  
ERIC G. BRUGGINK  
Senior Judge